HENRY C. SCHWARTZ *v.* VIOLA O. SCHWARTZ.
[No. 34, October Term, 1929.]

*Decided January 7th, 1930.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*George Arnold Frick* and *Francis I. Mooney,* for the appellant.

*J. Paul Schmidt,* for the appellee.

OFFUTT, J., delivered the opinion of the Court.

The parties to this appeal were married on June 29th, 1921. The appellant, Henry C. Schwartz, a widower with grown children, lived in Baltimore, where he carried on a wholesale and retail kraut and pickle business, had acquired some property, and received from his business and his property a comfortable income. Viola O. Schwartz, the appellee, was a widow, also with grown children, with whom she lived in her own home on Henrietta Street, in Baltimore. They met during the lifetime of the appellant's first wife, who was for some years prior to her death an invalid, apparently confined to her home, and, while there is nothing in the evidence to justify the conclusion that at that time they were anything

more than friends, they were at least very close friends, often together, and, not long after the death of the first Mrs. Schwartz, they were married.

Although they both lived in Baltimore at the time, they were married in Philadelphia, and their marriage was apparently not announced until the following September, when he and his children and she and her children went to live in the appellee's home, and on September 30th, 1922, Vivian O. Schwartz, the only child of the marriage, was born.

As might have been expected, the compulsory association of the members of these ill assorted families was neither happy nor harmonious. Schwartz's children apparently believed that the relations between Schwartz and the appellee, which culminated in their marriage, had begun and continued while his first wife, their mother, was confined to her bed by the illness which finally resulted in her death, and not unnaturally they resented that, and they disliked her. She on her part appears to have done little to conciliate them, so that from the beginning there was much bickering and ill feeling between appellee and Schwartz's children. They reproached her for her relations with their father during their mother's life, and she upbraided them for their disrespect; they quarreled frequently, and finally, acting, she said, on the advice of her physician, she asked Schwartz to take them away. Accordingly, in January, 1922, Schwartz established them in another home, although he continued to live with his wife in her home until December, 1923, when he, too, finally left her home. For a time after he left he allowed her ten dollars a week for her support and that of their child, but in the latter part of the year 1924, alleging that he had threatened to reduce that allowance, she had him arrested for nonsupport. In obedience to an order passed in that proceeding he paid her from that time on $15 a week for the support of herself and her infant child, but she continued to live apart from her husband, and on January 20th, 1926, she filed the bill of complaint in this proceeding against him. In that bill she alleges that he abandoned her and her infant child,

and prays that she may be divorced *a mensa et thoro* from him, that he may be required to pay permanent alimony for her support and also for the support of the child, and that the custody of the child be awarded to her. In due course Schwartz answered the bill, denied that he had abandoned his wife, and later filed a cross bill against her, in which he prayed that he might be divorced from her on the ground that she had abandoned him. She in turn denied so much of the cross bill as charged her with abandonment, and the case was tried in open court on those pleadings. At the conclusion of the case the court dismissed appellant's cross bill, and decreed that the appellee be divorced *a mensa et thoro* from the appellant, that he pay her $15 a week alimony, and that she have the custody of their infant child, subject to the appellant's right to visit and be with him at seasonable times and places. This appeal is from that decree.

Assuming that the appellee was entitled to any relief at all, neither the propriety of the amount allowed for alimony, nor the award of the custody of the infant child of the parties to the appellee, were questioned in this court, but the sole question presented is whether the trial court erred in finding that appellant had abandoned his wife.

Under Code, art. 16, sec. 39, a divorce *a mensa et thoro* may be granted where the erring spouse has been guilty of (1) cruelty of treatment, (2) excessively vicious conduct, or (3) "abandonment or desertion." Abandonment has been defined to mean the voluntary, unjustified, and final separation of one of the married parties from the other, accompanied by an intention to terminate the marital relation (*Buckner v. Buckner,* 118 Md. 113; *Keezer on Marriage and Divorce,* sec. 326; *Muller v. Muller,* 125 Md. 76; *Hubbard v. Hubbard,* 127 Md. 620; *Polley v. Polley,* 128 Md. 66; *Young v. Young,* 136 Md. 85; *Klein v. Klein,* 146 Md. 29; *Miller v. Miller,* 153 Md. 218; *Daiger v. Daiger,* 154 Md. 503), or an unjustified refusal to resume suspended cohabitation. *Buckner v. Buckner, supra.*

The fact that Schwartz actually left the home in which he was living with his wife, and which she owned, and event-

ually went to live with his children in the home which he owned, is undisputed, so that the inquiry is whether, under the circumstances of the case, (1) in so separating from his wife he intended to terminate the marital relation, (2) whether his act was justified, and (3) whether she was justified in refusing to accept his offer (assuming that it was made) to resume marital relations with her if she would come to live with him in his home with his children.

There can be little doubt that the disposition which the trial court made of the case would best promote the happiness and welfare of the parties to this appeal, but, since its right to grant that relief is challenged, the propriety of its decree is not to be measured by such considerations, but by the limits of the power which the legislature has granted to it in dealing with such cases, as that grant has been construed by this court. So that the question presented to the trial court was, not what would best serve the interests of the parties to the cause, but whether the evidence proved a ground for divorce under the statute. The evidence relating to that issue is not only conflicting but is vague, indefinite, and confused, both as to dates and incidents, and the only facts which emerge from it with reasonable certainty and clearness are that Schwartz did leave his wife's home, that since December, 1923, they have been living apart, and that it is impossible for Mrs. Schwartz and Mr. Schwartz's children by his first wife to dwell together amicably.

Mrs. Schwartz, testifying in her own behalf, said that prior to September, 1921, Mr. Schwartz suggested that he bring his three children to live with him in the house which she then owned, that she consented, and that Mr. Schwartz and his three children moved into her house, which she and her three children then occupied; that the Schwartz children ignored her, kept to themselves, failed to introduce her to such friends as happened to visit them, were disrespectful to her, and were so disagreeable and unpleasant in their manner that, acting upon the advice of her physician, she asked Mr. Schwartz to take them away until her baby was born; that he

did in January, 1922, take them away; that after her baby was born she asked him to bring them back, but that he reported to her that they refused to return. While neither of Mr. Schwartz's children admitted that they were in any way to blame for the unpleasant relations between them and Mrs. Schwartz, nevertheless their testimony tends to corroborate much of what she said in regard to their conduct towards her.

Mildred Schwartz, the oldest daughter, said that on one occasion, after an altercation over some household work, she had told Mrs. Schwartz "that she was no lady; if she had been she would not have gone with my father when my mother was still living; and that led to an argument. She tried to push me out of the door and I held on to the refrigerator. Q. How do you know she went with your father while your mother was still living? A. On several occasions my sister followed my father down to her home." Thelma, the younger daughter, also testified that Mrs. Schwartz nagged and abused them, and said that on one occasion "there was some argument over some trifling matter; I would not do what she said, or something, I supposed, and she grabbed hold of me and tried to choke me, and I shook her away, and on another occasion I was on the back porch and she wanted a little girl to disobey her mother— the little girl's mother wanted her to watch for her father to come home from work; she told Virginia to watch for her father, and Mrs. Schwartz wanted her to go to the store, and there it was some more talk about that, and I told the little girl if her mother told her not to go that she should not go, and Mrs. Schwartz came out and slapped me, and I started to go down to the factory to my father, and when I got there she had already called up and told my father the whole story, so I stayed there until supper time, when I came up with my father. They would not even let me practice on the piano."

And Mildred Schwartz further testified that after they had left the Henrietta Street home "on one occasion when she came down and wanted us to come back to live together.

She came down and asked if I would be willing if she would come down and live with us, and I said that we were living happily, and that if she would come down that I would not stay there because we had such contention when we were living with her, that I would not be willing to try it over again, that I would not stay at all. Q. So you agreed to leave if she came to the house? A. Yes, she said if I would be willing, that she would do everything in her power to make things different. She said that she had not done right by us when we were all there, and she would try to do better. Q. You said if she would come you would leave? A. Yes, it had just gotten on my nerves being up there."

Mrs. Schwartz further testified that after the children left Schwartz continued to live with her at her home until December 25th, 1923, but that, after his children had refused to return to Mrs. Schwartz's home, he became "grouchy," was always ready to "start an argument," repeatedly threatened to leave her and her baby, was never at home in the evening, never took her out, that he asked her for a separation; that in June, 1924 (after the separation), she asked him if there was not some way in which they could be happy together, and that he said: "There is only one thing that can be done, you go and give in to my children if they are willing," and "then I said, 'Very well,' and I went down to the place where he was living at the factory, Belmont Avenue, and I asked to see the oldest girl, and she came down, Mildred, and I asked her if she would not forgive and forget any malice they held against me, and let us all live together and be happy, and she said, 'That can never be done.' I asked her why, and she said, 'Just simply because we cannot live together, we are all happy here, why make a change?' With that her father stepped up on the porch and he asked me how I made out, and I said, 'Just the same as ever, they won't give in.' He said, 'You see they won't give in, and I cannot do without them,' and he said, 'Why not give me a separation,' and his daughter spoke up and said, 'Father, if you bring your wife back to live, Roland will leave,' and

he said, 'You see I cannot do without them,' and I left and went home." That after that she saw nothing of him until the following September, when he came to her home to see the baby. That on that occasion, after talking to the baby, he said to her, "Don't you intend to give me a separation?" "and I said, 'No, I don't.' He said, 'I am nothing to you.' I said, 'You are my lawful husband.' He said, 'I have never treated you as a husband and never intend to.' And my son hollered down the steps, 'Don't let him talk to you in such a way,' and he went to the steps and hollered, 'If you are man enough, come down here and put me out.' And my son came down and put him out on the porch."

Vernon Ency, Mrs. Schwartz's son, who happened to be asleep at her home at that time, testified that the loud talking waked him, that he heard Schwartz ask his (witness') mother to give him a separation and that, when she refused, Schwartz said: "Well, why not, you are nothing to me? I have never treated you as a husband and I never intend to, and the language he was using was some profanity in it, and I did not think my mother was entitled to any such treatment, and I called down to my mother to put him out if he did not know how to talk to her in the right manner, and he hollered back upstairs to me, 'If you are man enough to do it come down and do it yourself,' and although I was only half awake and half dressed I came down and pushed him out." The witness further testified that after that time Schwartz, so far as he knew, never returned to his mother's home. Mrs. Ency also testified that on one occasion she heard Schwartz ask his wife for a separation.

In addition to this evidence, the appellee offered the testimony of Florence A. Gould, an employee of the D. C. Smart Detective Agency, apparently designed to show that Schwartz was "infatuated" with a Mrs. Nagel. While the testimony failed to disclose any "infatuation" certainly on the part of Mrs. Nagel, who has since married, it did corroborate the impression made by the testimony of Schwartz, his wife, and his daughter, that he had an apparently irresistible crav-

ing for the society of women other than the one to whom he happened at the time to be married. He was, during his separation from his wife, a frequent visitor at Mrs. Nagel's home, and was so much at his ease there that he went about "in his shirt sleeves," accompanied her to church every Sunday, and occasionally went driving with her. Mrs. Nagel, when called as a witness for the appellee, denied that there was any impropriety in their relations, although she seemed to be unable or unwilling to commit herself to any positive estimate of his sentiments towards her, and when asked whether he exhibited "any infatuation," answered "No, not to any extent." She further, in explanation of his frequent visits, said that she rented the house which she occupied from him, that they were old friends, and that she would not have allowed him to visit her, had she not known that he was separated from his wife, and that he had told her that he "never did intend to live with her".

The testimony of Schwartz was recriminative, palpably colored, and not convincing. He said that he went to live with his wife at her home at her request, and that she promised to be a good mother to his children, but that when they were established there she treated the children "something scandalous"; that on one occasion she "was like a wild woman"; that she was "cussing and swearing and going on"; that her language was such that he would "not like to say what she did say." And when his modest scruples as to repeating her language were removed by counsel, he repeated certain vile and insulting names which, he said, she had applied to his daughters; that it was "like a piece of cold steel when she started off like a wild Indian"; that she nagged and abused them and finally ordered them from the house, and that after that he took them away, although he continued to live with her until December, 1923. He then attempted to describe in some detail other unpleasant occurrences of their married life, but his testimony was too blurred and incoherent to convey any definite impression, other than that of a mismated middle aged couple attempting, probably

with some sincerity, to make the best of their ill advised union, the woman with a temper not unnaturally exacerbated by the physical strain incident to her condition, aggravated by the reproaches of Schwartz's children, and the consciousness that she was battling with those children for the affection of her husband; the man, tired and disgusted with his wife's complaints and reproaches, losing his affection for her, and turning from her to his children by his first wife and to his friends for companionship. Finally, as a result of those conditions, he did on December 25th, 1923, leave her home, with the fixed intention of at least never again living with her in her house. He in his answer and his testimony inferentially denies that he deserted his wife, but asserts that he offered to continue to cohabit with her if she would come to live with him in the house which he owned. She denied that he ever made any such offer, and the case finally turns upon that issue.

Under the settled law of this state, there was nothing in the conduct of Mrs. Schwartz of which appellant complains of sufficient weight or importance to justify him in abandoning her. The voluntary separation of one spouse from the other, coupled with an intention to terminate the marriage relation, is regarded as a serious marital offence, and can never be justified except where the misconduct of the complaining party is of such a character as to actually menace the health or security of the other, or to make a continuance of the relation impossible without the loss of self-respect. In *Buckner v. Buckner, supra,* the court stated "that each case should be determined by its own particular circumstances," and in the same opinion it is added that "this court has consistently held that the law will not countenance the living apart of the husband and wife except for grave and weighty causes. *Taylor v. Taylor,* 108 Md. 134; *Childs v. Childs,* 49 Md. 509; *Hawkins v. Hawkins,* 65 Md. 104; *Schindel v. Schindel,* 12 Md. 294; *Jamison v. Jamison,* 4 Md. Ch. 294; *Hewitt v. Hewitt,* 1 Bl. 101; *Helms v. Franciscus,* 2 Bl. 568." And it is said in 9 R. C. L., page 364: "Though the

authorities are not in accord, some cases holding that to justify one spouse in leaving the other on account of the latter's ill treatment or misconduct, and to deprive the latter of the right to a divorce on the ground of desertion, the ill treatment or misconduct must be such as to entitle the former to a divorce, yet according to the prevailing view, especially in this country, ill treatment or misconduct of the husband, of such a degree or under such circumstances as not to amount to cruelty for which the wife would be entitled to sue for a divorce against him, might yet justify her in leaving his house, and prevent his obtaining a divorce for her desertion if she did so." And while that conclusion, in so far as it speaks of the "prevailing view," goes too far, it is at least the law of this state, subject, however, to the qualification, that no conduct will justify a separation unless it is such "as would render it impossible to continue the matrimonial cohabitation with safety, health and self-respect." 19 C. J., secs. 181, 116-117. And by way of illustration in the article last cited it is said: "It seems settled, however, that desertion is not justified by want of affection, incompatibility of temper, untidiness and slovenliness on the part of a spouse, neglect of domestic duties, difficulties with step-children, or frequent intercourse by the husband not amounting to cruelty, or because the husband invites members of his family to live with him, excludes the wife's son by a former marriage from the house." 19 C. J., 181, notes 84-93.

Applying those principles to the facts of this case, we are unable to discover in the pathetic trivialities, which constitute the appellant's complaints against his wife, anything sufficient to justify him in separating from her, and if in fact, when he did separate from her, he intended to finally terminate the marital relation existing between them, his act amounted to abandonment or desertion within the meaning of the statute. And, unless she subsequently refused an offer made by him in good faith to resume their suspended cohabitation, she was entitled to the relief prayed in her bill.

That he did voluntarily separate from her on December 25th, 1923, and that since then he has not cohabited with her, is not disputed. But whether by that act he intended to desert her is not at all clear. He himself said that he told her that he was going down to his home "and that if she wanted to come down, all right, her and the baby." But he was contradicted by Mrs. Schwartz, who said that he left without excuse or explanation, that although he returned a few days later he stayed only for the evening, and that when she saw him again two weeks afterwards he asked her for a separation. And while his statement was not corroborated, that of his wife was in part at least by the uncontradicted testimony of Mrs. Brohawn, formerly Mrs. Nagle, who said that he told her that he never intended to live with his wife, and by Mr. and Mrs. Eney, who testified that they had heard him ask his wife for a separation, and by his own admission that on at least one occasion he had asked her if she was ready to "give" him a divorce. While that evidence is not entirely satisfactory, it is at least sufficient to raise a *prima facie* presumption that in leaving her home Schwartz intended to desert his wife, and to cast upon him the burden of showing that he had no such intent. Schwartz himself did not in so many words deny that he had deserted his wife, or that when he left her he did not intend to finally separate from her, but he attempted to show that he had repeatedly invited her to live with him in his home. Such conduct, if proved, was sufficient to negative the presumption that in leaving her home he had intended to desert the appellee. For as the head and support of the family, he had the right to change the family domicile, and, when the change was made, it became and was her duty to follow him to the new domicile if he requested it, unless circumstances amounting in law to a legal excuse justified her in refusing his request. 19 *C. J.*, page 59, sec. 112; *Keezer on Marriage and Divorce,* sec. 338. But she was not obliged to follow him unless he did request her to do so (19 *C. J.*, page 59), and unless such request was made in good faith (9 *R. C. L.*, page 365-364),

and the change would not impair her health or safety or unreasonably interfere with her comfort. 19 *C. J.* 60; 9 *R. C. L.,* page 365; *Keezer on Marriage and Divorce,* sec. 338. Assuming that appellant did request appellee to live with him in his own home, in his brief he concedes that "it is probable that he would have endeavored to keep his daughters also there." Whether her refusal to occupy his home with him under such circumstances would have been justified, in the view we take of the case, need not be considered, although there is authority for that proposition. 38 *A. L. R.* 338; 47 *A. L. R.* 687. For in our opinion the evidence in the case fails to show that Schwartz ever in good faith made such a request. He himself, it is true, asserts again and again that he repeatedly requested her to come with their baby to his home and live there with him, but not only is his testimony to that effect not corroborated, but it is inconsistent with other statements and admissions made by him, and is contradicted by Mrs. Schwartz. Schwartz in his testimony said that when he was away from his wife she was continually "begging" him to come back, that on an occasion when he was moving his household effects from her home she was in the cellar crying, and he asked her whether she would come down and live with him, and she said: "No, she will stick to her children, I said, Well, then, you will have to stick to your children, I am going down in my old home." And in his answer he asserted that he "was forced by the conduct of the complainant herein and her son by a former marriage, to cease living with the complainant herein." His daughter, Mildred Schwartz, said that on one occasion Mrs. Schwartz came down to see her, and asked her if she would be willing to have her, Mrs. Schwartz, come down and live with them, and the witness told her that, if she did come, she the witness would leave. Mrs. Brohawn said that Schwartz told her that he never intended to live with his wife again, and Mrs. Schwartz herself testified that he had neither requested her to live with him nor even consented to it, except on one occasion he gave an implied consent contingent on the approval of his children, which they refused.

Considering all of the evidence, it was, in our opinion, not sufficient to show that Schwartz, after he left the home which he and his wife occupied, ever requested her to join him in his new abode, or that he was willing to renew their cohabitation. Under such circumstances, no inference is possible other than that, when he left his wife's home, he did so with the fixed and final intention of having no further matrimonial cohabitation with her, and that his act amounted to desertion. From this conclusion it follows that, in our judgment, the decree of the trial court was free from error, and it will accordingly be affirmed.

*Decree affirmed, with costs.*