## BOWERSOCK *v.* BOWERSOCK

[No. 181, October Term, 1955.]

*Decided July 10, 1956.*

The cause was argued before BRUNE, C. J., and DELA-
PLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*Eugene M. Childs,* with whom were *Childs and Bald* on
the brief, for appellant.

*Ridgely P. Melvin, Jr.,* for appellee.

COLLINS, J., delivered the opinion of the Court.

This is an appeal from a decree dismissing the amended
bill of complaint of Robert W. Bowersock, appellant, for a
divorce *a vinculo matrimonii* from his wife, Dorothy Barrett
Bowersock, appellee.

These parties were married on May 20, 1938, in Phila-
delphia, Pennsylvania. They lived together until 1940. Dur-
ing those two years the appellee left her husband several times
and returned. She finally left him in the spring of 1940.
Three children were born as a result of that marriage, a
daughter, Lorraine, eighteen, a daughter, Carolyn, seventeen,
and a son, Robert, sixteen, at the time of the trial below on
December 16, 1955. The husband, who has been a resident
of Maryland all his life, testified before an examiner that,
after his wife left him in 1940, he tried to persuade her to
return to him but she would not do so. On March 1, 1942,
she was committed to Embreeville State Hospital, Embreeville,
Pennsylvania, a State mental institution. She was taken there
by her father and sister. Three or four months previous to
her entry there, she had terrible crying spells and wanted to

die. She has been in that institution since that time. The appellant and his son live with his aunt, Mrs. Leona Cox, in Anne Arundel County, Maryland. The two girls have been living with his wife's mother for many years. His wife, previous to her marriage to him, was married at the age of thirteen years, and was divorced from her first husband.

On December 13, 1955, the appellant filed an amended bill of complaint in which he alleged the aforesaid marriage, the birth of the aforesaid children, and his residence in the State of Maryland for more than two years. He further alleged that the appellee without just cause or reason abandoned him, and that said abandonment had continued uninterruptedly for more than eighteen months prior to the filing of the bill of complaint. He further alleged that his wife, after said desertion, became permanently and incurably insane without hope of recovery, and as a result had been confined in the aforesaid mental institution since March 1, 1942. He prayed a divorce *a vinculo matrimonii,* and the care and custody of his minor children.

Mrs. Leona Cox, the aunt of the appellant, testified before the examiner that her nephew and his son lived with her. She further stated that during the marriage he had treated his wife well and she left him time and time again. The desertion had continued uninterruptedly since 1940. Her nephew has raised his sixteen year old son. Harrison J. Gaston testified before the examiner that he had known the parties to this suit for approximately twenty-six years. He was their mutual friend. She was interested in her first husband. The appellant gave his wife no just cause or reason to leave him. The appellant was a devoted husband and gave his wife everything she wanted. He has always acted in a proper manner.

Dr. Eleanore R. Wright testified in a deposition that she was a psychiatrist, a graduate of a medical school and clinical director of the Embreeville State Hospital. She came to that institution on June 27, 1955, and met the appellee in July of that year. She was familiar with the appellee's case history. Mrs. Bowersock was admitted to that institution on March 1, 1942, having been mentally depressed for three months. She had neglected herself and her children. She had had intervals of mental confusion and had expressed the desire

to die. She had lost forty pounds in the year before her admission to that institution, and had been there since March 1, 1942. She testified that the appellee is still mentally ill. Her thought processes are disassociated. She is out of contact with reality. When asked what was her prognosis of Mrs. Bowersock's condition, she replied: "Our term for the prognosis is guarded to poor. This indicates that we cannot be optimistic about her response." She had had seventy electric convulsive treatments and also, on June 4, 1952, a transorbital leucotomy, which is brain surgery. Recently she had been given Thorazine, which is a new drug being used in mental illnesses. After this brain surgery there was no change in her behavior except that she was "more quiet". She further stated that at the present time appellee was not able to distinguish between right and wrong. On cross-examination she stated that after each treatment of electric shock, she showed some improvement and also there had been some improvement in her condition since she had been taking Thorazine. Her present condition was better than it was at the time she was admitted to the hospital. She could not say when she would be released as cured. When asked what were her chances of recovery, she replied: "I could only give you a very vague approximation and I would say somewhere between 30 and 50 per cent." When asked whether she could say with any degree of certainty "when she would recover within the limits of that 30 to 50 per cent chance", she replied: "No, sir. I might clarify that by saying that we have had patients in the hospital for thirty years who suddenly recovered." She could not say that appellee's condition was permanently incurable nor could she say that it was not permanently incurable. The appellee was at the institution on an indefinite commitment.

Dr. Arthur O. Hecker testified in a deposition that he was a physician specializing in psychiatry at the Embreeville State Hospital. He had reviewed Mrs. Bowersock's case history at the time of her commitment on March 1, 1942. She was mentally ill with schizophrenic reaction. When asked whether her condition was permanent or temporary, he replied: "Frankly, I would not determine it to be either except to this

extent. It was certainly not temporary, having existed at least since March 1942 to the present time. I cannot give a medical opinion that any illness is permanent. However, in view of the prolonged period of symptoms, the chances of recovery are lessened to the chronicity." Her mental judgment is still quite impaired. When asked what was his prognosis of her condition, he replied: "Ordinarily the prognosis in schizophrenia of this duration and the treatment the patient has received is poor. She has recently responded somewhat to Thorazine. Nevertheless, experience would indicate that the prognosis remains poor."

As a result of the aforesaid testimony the chancellor found that it did not meet the requirements of Code, 1951, Article 16, Section 35, and the facts would not entitle the appellant to a divorce on the ground of abandonment. Accordingly he dismissed the appellant's amended bill of complaint and allowed a counsel fee of $40.00 to the counsel for appellee. From that decree the appellant appeals.

Code, 1951, Article 16, Section 35, *supra,* Chapter 497 of the Acts of 1941, provides in part: "A divorce a vinculo matrimonii may be granted when either husband or wife has become permanently and incurably insane, provided that no divorce shall be granted under this section unless such permanently incurable insane person shall have been confined in an insane asylum, hospital or other similar institution for a period of not less than three years prior to the filing of the Bill of Complaint, nor unless the Court shall find from the testimony of two or more physicians competent in psychiatry that such insanity is permanently incurable with no hope of recovery, and provided further, that no such suit shall be maintained unless one of the parties is an actual resident of this State, and shall have resided therein for at least two years immediately prior to the institution of the proceedings. * * * Upon the return of process duly served, or upon proof of due publication, as the case may be, the Court shall require the Committee to appear and answer for said defendant, if one has been so appointed, and if not, the Court shall appoint a Guardian ad Litem to appear and answer for said defendant." It also provides that where the plaintiff is the husband, the

court may require him to pay alimony, support and maintenance for the benefit of the wife and also that the court may modify or revoke any order relating to the custody of infant children and their support. All court costs, including the compensation of the defendant's attorney, shall be paid as the court shall direct.

Upon the petition of the husband, who alleged that his wife had no legal guardian, George J. Crowley was appointed guardian *ad litem* under the provisions of Article 16, Section 35, *supra,* for Mrs. Bowersock, and Ridgely P. Melvin, Esquire, was appointed counsel for the guardian *ad litem.* Article 16, Section 35, *supra,* enacted in 1941, first came before this Court in the case of *Dodrer v. Dodrer,* 183 Md. 413, 37 A. 2d 919, decided June 13, 1944. In that case the question was whether the defendant had been confined in an insane asylum, hospital or other similar institution for a period of not less than three years prior to the filing of the bill of complaint. There, it was pointed out that the determination of causes for which divorces may be granted is a matter for the Legislature. The policy underlying such determination, whether narrow or broad, restricted or liberal, was for legislative decision. After discussing the rules to be followed in statutory interpretation, and the requirement of confinement for three years, it was there said:

"The other proviso is that the court must find from the testimony of two or more physicians competent in psychiatry that the insanity is permanently incurable. This does not mean that, if two psychiatrists testify to that effect, the court must make such a finding. The court makes its finding from all the facts before it, but this must include such testimony by two psychiatrists. In the case before us we have this testimony."

The above quoted comment might be interpreted to mean that, unless two psychiatrists testify definitely that the insanity is permanently incurable, with no hope of recovery, the court could not so find. However, in the case of *Roberts v. Roberts,* 198 Md. 299, 82 A. 2d 120, where the question presented was also whether the wife had been confined for the period of not less than three years prior to the filing of the bill of complaint, this Court there said: "When the

Legislature added to the causes for divorce that of permanent and incurable insanity, it did not leave this question to be determined as other questions are determined, by general proof, but required certain specific facts to be shown. No divorce on such grounds could be granted unless the person claimed to be insane should first have been confined in an insane asylum, hospital or other similar institution for a period of not less than three years prior to the filing of the bill, and, second, *not unless the court should find from the testimony of two or more physicians competent in psychiatry that such insanity is permanently incurable, with no hope of recovery.* We had this statute before us in the case of *Dodrer v. Dodrer,* 183 Md. 413, 37 A. 2d 919, and held that the confinement included the placing of a patient in a private home under the supervision of the person who conducted the hospital or insane asylum. We did not, however, and could not, change the positive prohibition of the Legislature against granting a divorce for insanity unless the two mentioned requirements of proof were complied with." (Italics supplied.) We are, therefore, of opinion that the court may determine from the testimony of two or more physicians competent in psychiatry that such insanity is permanently incurable, with no hope of recovery, although the two psychiatrists do not so directly testify in the words of the statute.

In the instant case the testimony of Dr. Hecker might support a finding that the insanity of Mrs. Bowersock is permanently incurable, with no hope of recovery. However, such an inference cannot be drawn from the testimony of Dr. Wright when she says that Mrs. Bowersock has a thirty to fifty percent chance of recovery. The statute requires testimony from two psychiatrists and, as we have only the testimony of one to that effect, we agree with the chancellor that the divorce should not have been granted on the grounds of insanity.

As to the divorce on the grounds of desertion, in the opinion originally filed in this case we were of opinion that the chancellor had no jurisdiction to grant a divorce for desertion. The jurisdictional question was not mentioned in the argument or the briefs. A motion for reargument was filed by the appellant citing authorities on this point for the first time. The appellee,

although committed to Embreeville by two physicians, has not been adjudicated insane. Under Code, 1951, Article 16, Section 31, giving the equity court jurisdiction in actions for divorce, it is provided in part: "* * * if the party against whom the bill is filed be a non-resident, or a person who may be proceeded against as a non-resident, then the same process by summons, notice, or otherwise, shall be had to procure the answer and appearance of the defendant, as is had in other cases in chancery; * * *."

The original bill of complaint filed in this case prayed a divorce solely on the grounds of insanity. Code, 1951, Article 16, Section 149, provides: "In all cases in chancery, if any person *non compos mentis* and not residing in this State is a defendant, the court may order notice to be given to such non-resident, by publication in some newspaper, to appear and answer such bill or petition, and upon the failure of such non-resident to appear and answer the bill or petition, such decree may be passed as the circumstances of the case may require; provided no decree shall pass unless the allegation in the bill or petition are fully proved, under a commission to be issued for that purpose, or before one of the examiners of the court; the court shall assign a solicitor for such non-resident defendant to cross-examine the witnesses, which solicitor shall be paid by the plaintiff, or out of the estate of the defendant, at the discretion of the court." Code, 1951, Article 16, Section 160, provides for personal service of the order of publication. The original bill was served upon the appellee as well as upon the superintendent of the hospital where she was confined. In referring to personal service of the order of publication on a non-resident, this Court said in *Fisher v. Parr*, 92 Md. 245, 272, 48 A. 621: "It is not supposed that it was intended by this enactment to give equity Courts jurisdiction of non-residents in proceedings *in personam*, but that, as was said in *Long v. Home Ins. Co.*, 114 N. C. 465, 469, 19 S. E. 347, the method of service prescribed by the Act of 1896 'is a convenient and probably a more sure way of bringing home to the non-resident the notice which formerly was made solely by publication * * * but that the service of process in another State is valid *only in those cases in which the publication of the process* would be

valid.' As we have already said, however, the actual service of process beyond the limits of the State cannot give our Courts jurisdiction over the persons of non-residents in actions *in personam*." It was said in *Epstein v. Epstein*, 193 Md. 164, 170, 66 A. 2d 381: "In a suit for a divorce or separation the only *res* in Maryland which will support jurisdiction *in rem* is the marital status when one or both parties are domiciled in Maryland." See *Williams v. North Carolina*, 317 U. S. 287, 63 S. Ct. 207, 87 L. Ed. 279, 143 A. L. R. 1273. The husband here has been domiciled in Maryland all of his life.

Under the provisions of General Equity Rule No. 17 the chancellor allowed the amendment of the bill of complaint. The bill of complaint was amended praying for a divorce on the grounds of abandonment before the taking of testimony. General Equity Rule No. 22 provides in part: "In every case where an amendment to the bill shall be made after answer filed, a written notice of such amendment, or a copy thereof, shall be served upon the defendant or his solicitor of record, * * *." An answer was filed by the guardian *ad litem* through his attorney to that amended bill of complaint. It was said in *Dougherty v. Dougherty*, 187 Md. 21, 29, 48 A. 2d 451: "The decisive question on this appeal is whether testimony should have been admitted to show that complainant was guilty of adultery. The chancellor refused this testimony because (1) the answer and cross-bill did not allege adultery, and (2) defendant could not properly amend after the trial commenced. By express provision of statute, either the complainant or defendant in any case in a court of equity has the right to amend the bill of complaint or answer at any time before final decree, so as to bring the merits of the case fairly to trial. Code, 1939, Art. 16, Sec. 18. We have held, however, that the right to amend is not a right *ex debito,* but is subject to the sound discretion of the court. In other words, it may be stated as a general rule that the chancellor is clothed with discretion in allowing or refusing amendments at any time before final decree, and such discretion will not be reviewed in the absence of its abuse." We are therefore of opinion that the appellee was properly before the chancellor for the purpose of deter-

mining whether the appellant was entitled to a divorce on the grounds of desertion.

As to the facts of desertion, the appellee finally left her husband on March 24, 1940. Chapter 90 of the Acts of 1941, reducing the period of abandonment from three years to eighteen months, Code, 1951, Article 16, Section 33, became effective June 1, 1941. The eighteen month period of abandonment in this case expired September 24, 1941, and the appellee was not committed to Embreeville until March 1, 1942. The crying spells did not develop until three or four months before that date, which was after September 24, 1941. There is no evidence of any insanity until after September, 1941. There is no evidence that the wife had any intention of returning to her husband. It has been generally held that a divorce for desertion may be obtained from an insane defendant where the cause of action accrued during the sanity of the defendant, notwithstanding the subsequent insanity. 17 *Am. Juris.* page 198; 27 *C. J. S.* page 598; *Harrigan v. Harrigan,* 135 Cal. 397, 67 P. 506; *Steed v. Steed,* 54 Utah 244, 181 P. 445; 4 *A. L. R.* 1334; 19 *A. L. R.* 2d 171, 174; *Toepffer v. Toepffer,* 151 Kan. 924, 101 P. 2d 904; *Cain v. Milburn,* 192 Iowa 705, 185 N. W. 478; *King v. King,* 214 Ky. 171, 283 S. W. 73; *Fisher v. Fisher,* 54 W. Va. 146, 46 S. E. 118; *Gartner v. Gartner,* 109 N. J. Eq. 112, 156 A. 673; *Heim v. Heim,* 35 Ohio App. 408, 172 N. E. 451. It was said in *Wright v. Wright,* 125 Va. 526, 99 S. E. 515, 4 A. L. R. 1331: "While it may be regarded as settled by the great weight of authority that the insanity of the defendant is no bar to the prosecution of a suit for divorce for a cause which accrued before such insanity began, yet the precise question presented by this record appears to have arisen in very few cases. If the desertion had continued for three years before the insanity of the defendant intervened, then the cause of action would have been complete and the insanity would have been no defense." It was said by this Court in *Noellert v. Noellert,* 169 Md. 559, 561, 562, 182 A. 427: "It will be observed that appellant's allegations are that *subsequent* to the abandonment and desertion for which she obtained her decree, appellee was adjudicated

an incompetent, and she now *believes* that even before the decree and at the time of the abandonment of which she complained in her bill his mental condition was such that she was not justified in seeking a divorce. This is far short of alleging his incompetency *at the time of the desertion* or within three years thereafter, and for all that is alleged in her petition, defendant may have been entirely sane at the time of the desertion and continued in that state until near the time of his adjudication almost five years later. Hence the allegations of the petition are not in conflict with the theory that appellee was sane at the time he deserted appellant and that such sanity continued the full statutory period of three years, and that some time subsequently thereto he became *non compos,* in which case there seems to be no division of authority that such insanity, although existing at the time the suit for divorce was brought, would not be a bar to the suit. *Wright v. Wright,* 125 Va. 526, 99 S. E. 515, 4 A. L. R. 1331, and cases there cited; 34 *A. L. R.* p. 221; 9 *R. C. L.* p. 375; *Miller's Equity Procedure,* p. 21; 19 *C. J.* p. 77; *Schouler, Marriage, Divorce, Separation* (6th Ed.) sec. 1679. From the authority last cited we quote as follows: 'While a divorce will not be granted for acts committed during insanity, a divorce may be obtained for acts happening prior thereto notwithstanding the subsequent insanity. So desertion may be committed and a divorce obtained therefor although the defendant became insane before the action was brought, where he was of sound mind when the desertion for the statutory period occurred.' See also *Stigers v. Brent,* 50 Md. 214."

We are therefore of opinion that the appellant should have been granted a divorce on the grounds of desertion and the decree will be reversed and the case remanded for the passage of such a decree.

At the argument in this Court, counsel for the appellant suggested that the fee of $40.00 awarded to counsel for the appellee was inadequate and that it be increased here. As no cross appeal was taken by the appellee from that award, and as no petition was filed below for counsel fees in this Court, the question of counsel fees for appellee's counsel is

440

not before us here. *Danziger v. Danziger,* 208 Md. 469, 476, 118 A. 2d 653, 656.

We are also of opinion that the chancellor should retain jurisdiction for the purpose of awarding custody of the infants, if necessity for such award should arise.

*Decree reversed in part and affirmed in part, and cause remanded for the passage of a decree in conformity with this opinion. Costs to be paid by the appellant.*