SEWELL *v.* SEWELL

[No. 16, September Term, 1958.]

*Decided October 27, 1958.*

The cause was argued before BRUNE, C. J., and HENDER-SON, HAMMOND, PRESCOTT and HORNEY, JJ.

*C. Edward Nicholson* and *Charles D. Sanger, Jr.,* for the appellant.

*Donald K. Staley* and *Emma B. Waldrop* for the appellee.

BRUNE, C. J., delivered the opinion of the Court.

This suit was begun on April 21, 1955, by the appellant wife's filing a bill of complaint seeking a divorce *a vinculo* from the defendant husband on the ground of desertion based upon his asserted refusal of normal marital relations, and seeking custody of their minor son, then about five years old, and alimony and suit money. The husband answered the bill on August 30, 1955, denying desertion. On December 7, 1955, he filed a cross-bill for a divorce *a mensa,* alleging that his wife had deserted him on April 22, 1954, later amended

to 1955, and he sought custody of their son, Ronnie. The wife filed an answer denying desertion on her part. Subsequently, on July 10, 1957, by leave of court and with the consent of the wife's then counsel, the husband filed an amended cross-bill seeking a divorce *a vinculo* based upon the same alleged desertion by the wife on April 22, 1955, but which included as a part of the necessary eighteen months' period time which had elapsed since the filing of his original cross-bill. The Circuit Court dismissed the wife's bill, granted the husband a divorce *a vinculo,* and awarded custody of the child to the husband. The wife appeals, but does not seek a reversal of that part of the decree which denied her a divorce.

The principal questions presented in this court are: (1) whether the trial court had jurisdiction to award the husband a divorce *a vinculo* on the amended cross-bill where a part of the time necessary to support his claim therefor elapsed after the filing of the original cross-bill for a divorce *a mensa;* (2) whether the evidence was sufficient to show desertion by the wife; (3) if so, whether it was sufficiently corroborated; and (4) the custody of the child.

Most of the testimony in this case was taken before an examiner at various hearings extending over a period of months. Judge Reeves commented on this aspect of the case: "While the Court had occasion to observe these parties at the time of one hearing on the question of support for the child, the Court did not have the opportunity of observing the witnesses and of attempting to judge of their sincerity and truthfulness in the statements which they made. The Court must, therefore, take the record as it is found * * *." The trial judge reviewed the testimony of the various witnesses. He concluded that the wife's claim of desertion by the husband was not established; and since there is no attack on the part of the decree which dismissed her bill for divorce, we see no purpose which would be served by our reviewing the testimony on this branch of the case, except to refer to such parts of it as seem to have a bearing on the fitness of the father to have custody of the child.

We shall take up first the second and third questions above

stated—the sufficiency of the evidence to show desertion by the wife, and the sufficiency of corroboration of the husband's testimony.

The marriage of the parties was the second for the wife and the third for the husband, and the previous matrimonial ventures of each had wound up in divorce. The parties were married in Elkton in March, 1949, and their child was born on April 29, 1950. The husband is now about sixty-four years old and the wife is about fifteen years younger than he. Their marriage does not appear to have been a happy one for even a brief time. Some of the difficulties were financial. After the parties had lived in two or three places, a financial crisis led to their having to sell their home in Montgomery County, which, otherwise, was about to be sold on foreclosure. Mrs. Sewell had furnished at least a substantial part of the payments on account of the purchase price which had been made.

The testimony is far from clear as to what the parties contemplated as to future plans when they sold the house. Mrs. Sewell's original home had been in Texas, and at some time prior to the sale of the house the parties had considered moving there. Mrs. Sewell still wishes to do so, but has no definite plans for such a move. At some time probably early in 1955, Mr. Sewell had obtained an estimate of the cost of moving their furniture to Texas either on a direct move or under a transit storage arrangement. Just before the Sewells sold their house Mr. Sewell had been on a trip to Illinois to seek to borrow money from a relative to avoid foreclosure. On being informed en route of arrangements for the sale, he abandoned the trip and returned to Montgomery County. The sale was made on April 21, 1955, but the Sewells might have continued to occupy the house until at least May 15th and possibly May 30th.

On the day of the sale, April 21st, Mrs. Sewell filed her suit for divorce. The next day she had the furniture moved out of the home. She says that Mr. Sewell had told her she could call up the moving people from whom he had obtained the estimate above mentioned, but she called a different moving company. Mr. Sewell returned to the home after finish-

ing his day's work and was angry to find the furniture already loaded on a truck. Some clothing and dishes and probably some cooking utensils were left in the house. Notwithstanding the almost complete lack of furniture, the parties and the boy spent the night at the house. The next day or the day after that Mrs. Sewell took her fifteen year old daughter by a former marriage and Ronnie to Texas, in order to put the girl in school there. This daughter had been living with her mother and stepfather. Mrs. Sewell did not inform Mr. Sewell of her plans nor, apparently, did she communicate with him at all during her trip. On her return she did call him and told him he could pick up Ronnie at their former home, if he wanted to. This was on or about May 15, 1955. Mr. Sewell did pick up the boy and saw his wife at that time and place.

During Mrs. Sewell's trip, Mr. Sewell bought a trailer and had it placed in a trailer park in Prince George's County. He has lived in it ever since. During a considerable period he has had the boy, Ronnie, living with him and he seems to have taken good care of the child. Even when the parties were living together, Mr. Sewell seems to have done a great deal in actually taking care of Ronnie. In 1955 Mr. Sewell placed him in a good nursery school in Virginia near his own place of employment. Custody of the child seems to have alternated between the husband and the wife during this litigation. Shortly prior to the decree the wife had custody of him; but when he was living with one parent, the other has been allowed rights of visitation.

The testimony of the parties is in direct conflict with regard to whether or not Mr. Sewell sought to have Mrs. Sewell come to live with him in the trailer. It is perfectly clear that Mrs. Sewell did not go there to live with him, but the only testimony that she was invited to do so and that she refused to do so is Mr. Sewell's. The Chancellor accepted Mr. Sewell's contention that a mobile trailer, with two bedrooms, for occupancy by four people (Mr. and Mrs. Sewell, Ronnie, and presumably Mrs. Sewell's daughter) was the best that he could do in his present financial circumstances, though the Chancellor conceded that this would not

afford ideal living conditions. He concluded that "when Mr. Sewell has provided a place for the family to live, even though not under ideal conditions, and his wife has declined to live with him, that she has deserted him." He accordingly held that the husband was entitled to a divorce *a vinculo*.

The wife's trip to Texas two or three days after the enforced sale of the parties' home, made for the purpose of putting her daughter in a school there, would not, we think, of itself constitute desertion.

There is nothing to show when the husband first knew of the wife's suit for a divorce. It is fairly clear that he knew nothing as to whether or when the wife intended to return from Texas. He bought the trailer during her absence and says that he did so with the intention of using it as a home for the family. He says that his wife refused his invitation to live in it with him on three occasions—once at their old house on or about May 15th, 1955, when she turned Ronnie over to him, and twice later when she visited him at the trailer.

The problem of corroboration of the cross-complainant's (husband's) testimony still remains. It is required in a suit for divorce (Code, 1957, Art. 35, Sec. 4). There are many cases in which this court has been called upon to deal with the question, and the rule is well settled that where the divorce is genuinely contested and there is no basis for inferring collusion, slight corroboration may be sufficient. *Kelsey v. Kelsey,* 186 Md. 324, 46 A. 2d 627; *Harp v. Harp,* 198 Md. 485, 84 A. 2d 895; *Lent v. Lent,* 202 Md. 240, 96 A. 2d 14. There must, however, be some corroboration. *Hodges v. Hodges,* 213 Md. 322, 131 A. 2d 703; *Trout v. Trout,* 214 Md. 531, 135 A. 2d 893; *Zink v. Zink,* 215 Md. 197, 137 A. 2d 139. Before the wife's failure to follow the husband to a new domicile selected by him can serve as the basis for a finding that she has deserted her husband, a request that she join him must be made in good faith, and the request must be corroborated. *Schwartz v. Schwartz,* 158 Md. 80, 91-92, 148 A. 259.

The fact that a wife has left her husband under the belief, manifested by her bringing suit for divorce a few days later,

which proved, however, to be mistaken, that she had a valid cause for divorce against him, has been held not to show desertion on her part. See *Crumlick v. Crumlick,* 164 Md. 381, 165 A. 189, another case in which the wife has sought unsuccessfully to prove desertion by the husband because of the cessation of marital relations.

The mere fact that the wife did not join the husband in his new home clearly does not, in and of itself, corroborate his claim that he requested her to do so. *Schwartz v. Schwartz, supra.* Nor, as the *Schwartz* case, and as both of the cases cited by the appellee relating to the husband's general right under the law of this State to choose the marital domicile, all hold, is the husband's right of choice an absolute one.

The appellee cites *Hoffhines v. Hoffhines,* 146 Md. 350, 126 A. 112, and *Bennett v. Bennett,* 197 Md. 408, 79 A. 2d 513. In the *Hoffhines* case the wife refused to return to live in the home of the husband's parents. Previous experience had proved such residence unsatisfactory and the husband was able to provide a separate home. The wife's refusal was held not to constitute desertion. In the *Bennett* case, the husband claimed that a two-bedroom house was the best that he could furnish for the family, which consisted of himself, his wife and their four children. In that case this court commented upon the fact that the "wife swore that she was willing to seek employment to contribute toward the cost of a house that would be adequate for the family." It was held that the wife's refusal to accept the husband's choice did not constitute desertion. We may note in the instant case that the wife has been employed since before the separation in 1955 and still was when the last testimony was taken.

As was said in the *Bennett* case (197 Md. at 412), "A wife is not obliged to follow her husband unless he requests her to do so and such request is made in good faith, and the change of domicile would not impair her health or safety or unreasonably interfere with her comfort. *Schwartz v. Schwartz,* 158 Md. 80, 91, 92, 148 A. 259."

We conclude that desertion of the husband by the wife was not established because of the lack of corroboration. Hence we need not pass upon the first question above stated

as to whether or not the amendment of the husband's cross-bill was properly permitted. Cf. *Smith v. Smith,* 216 Md. 141, 140 A. 2d 58, and cases therein cited. See also the new Maryland Rule 1190 c, 3, approved since the decision in the *Smith* case to take effect January 1, 1959.

The third question is with regard to the custody of the child, Ronnie. It is, we think, unfortunate that practically all of the testimony bearing on this question was taken before an Examiner and that we have no appraisal of the witnesses by any judicial officer. On the record before the Chancellor and before us, we are not prepared to say that the Chancellor was clearly in error. Where he has not seen and heard the witnesses, the concluding portion of Rule 886 a of the Maryland Rules requiring that due allowance be made for the opportunity of the lower court to judge the credibility of the witnesses is not applicable, and the written testimony is as available to us as to the Chancellor; but the fact that he did not have the witnesses before him does not vitiate the first portion of that Rule which requires this Court to review a case tried by the court without a jury on both the law and the evidence, and prohibits setting aside the judgment of the lower court on the evidence unless clearly erroneous. See *Oliver v. Oliver,* 217 Md. 222, 140 A. 2d 908. Here the Chancellor had the parties before him only on one apparently rather brief hearing on the amount of support to be allowed for the child while in the custody of the mother, but the witnesses who expressed views bearing upon the fitness of the respective parties to have custody of the child and as to what they deemed for the best interests of the child testified only by deposition.

There was testimony from a number of witnesses, several of them neighbors of the husband who observed the father and child while they were living together at the trailer park, and from a friend of both parties for a number of years. There was also testimony from the head of the nursery school which Ronnie attended while living with his father. The child was kept neat and clean, seemed happy and contented and was well adjusted in the school. There was testimony as to great affection between the father and son—perhaps of almost too

much affection on the part of the father resulting in little discipline of the child. This testimony as a whole, we think, supports the award of custody to the father. There is, on the other hand, some testimony of lack of affection on the part of the mother towards the child; but certain statements of hers that he was "a little brat" and "the worst child she ever had" may not have amounted to more than expressions of temporary irritation with the child. There is also testimony (though rather little from outside sources) that she was a good mother to this child. The evidence also indicates that the father had neglected any religious training for the child, at least up to the time he was about six or seven.

There is in the record some testimony by the wife to the effect that the husband sought to have unnatural sex relations with her at the time when efforts at normal relations failed. Also, the wife's fifteen-year old daughter testified as to alleged obscenities on the part of the husband at various times, some of which were said to have occurred in the presence of friends of this young girl. All this testimony was denied by the husband. The Chancellor appears to have regarded it as having been offered in support of the wife's divorce action and not to have considered it specifically as bearing on the custody question. However, he seems to have given little credence to the wife's testimony on this point. He found the young girl's testimony irrelevant to the wife's divorce action since the girl admitted that she had not informed her mother of the alleged incidents until after the separation had occurred. He also noted that it had not been corroborated as to two matters with regard to which corroboration would have seemed readily available, and evidently gave no credence to the testimony. In this we cannot say he was in error.

The best interests of the child are controlling in cases of this sort. *Trudeau v. Trudeau*, 204 Md. 214, 103 A. 2d 563; *Townsend v. Townsend*, 205 Md. 591, 109 A. 2d 765; *Oliver v. Oliver, supra*. We take it that the child is now in the custody of the father in accordance with the decree of the Circuit Court.

Although in many cases involving children of tender years, this court has held that the best interests of the child would be served by custody being awarded to the mother, this is

not an inflexible rule. Custody of a boy of approximately the same age as the child in this case was awarded to the father in *Carter v. Carter,* 156 Md. 500, 144 A. 490. In the instant case it may be noted that since both parties are employed, neither would be able to care for the child during all hours when he is not in school and either one would need assistance from some other source. It also appears that the wife's daughter would not be available to render such assistance.

The Chancellor attached a good deal of importance to the wife's expressed desire to return to Texas. Her desire to leave this State is certainly not controlling, but is a factor which might properly be considered because of the probability that it would cut the boy off from any association with his father. The Chancellor noted this, but seems to have considered it more from the point of view of the father's wishes than that of the child's welfare.

A custody decree is always subject to review (Code, 1957, Art. 16, Sec. 25), and the affirmance of the decree will therefore not prevent the mother from seeking to reopen it. We have already commented upon the lack of opportunity of the Chancellor to see and hear the witnesses, and apparently there was no investigation of the relative fitness of the parents to have custody of the child by the Court's Probation Department or by any other comparable agency. Doubtless some such investigation would be available in case of a request to reopen the matter.

The appellant's counsel have requested an allowance of a counsel fee for their services in connection with this appeal. No such application appears to have been made to the trial court. It should first be made there. *Danziger v. Danziger,* 208 Md. 469, 476, 118 A. 2d 653, 656; *Bowersock v. Bowersock,* 210 Md. 427, 439-440, 123 A. 2d 909, 915.

> *Decree affirmed in part and reversed in part: affirmed as to dismissal of the appellant's bill; reversed as to granting a divorce to appellee; affirmed as to award of custody of the minor child to the appellee; the costs of this appeal to be paid by the appellee.*